IN THE MATTER OF THE APPLICATION FOR A SUMMARY INVESTIGATION OF COMPLAINTS AS TO THE ELECTION OF A BOARD OF DIRECTORS OF THE WOODCLIFF TRUST COMPANY, HELD ON THE 9th DAY OF JANUARY, A. D. 1923.

Argued March 22, 1923—Decided June 5, 1923.

**Corporations—Elections—Review by Supreme Court—Quorum— Voting Trust Stock—New Election Ordered.**

On petition.

Before Justices PARKER and BERGEN.

For the petitioners, *J. Emil Walscheid.*

For the respondents, *Warren, Britt & Stanton.*

PER CURIAM.

This is a summary proceeding under section 42 of the Corporation act, begun by petition and rule to show cause, investigation by depositions ordered by Mr. Justice Swayze, depositions taken and now before us.

Petitioners' fundamentals of argument run thus: The election was void and should be set aside because there was not a quorum of stock voted under the by-laws. That the reason there was not a quorum is that a block of two hundred shares, standing in name of Howard V. Meeks, trustee, was subject to a voting trust limiting the powers of the trustee,

and that he exceeded his powers over the protest of petitioners or one of them who were among the *cestuis que trust*. That he exceeded his powers because the trust agreement provided that "all questions to be determined to carry out the provisions of this agreement shall be decided by a vote of two-thirds of all the subscribers." That the question of how he should vote had not been so decided, but his vote was based on instructions of nine subscribers out of fourteen, four voting *contra* and the fifth being ignored, on a pretext alleged to be frivolous.

Assuming for the present the correctness of this chain of reasoning if the facts be correct, the first question relates to the alleged frivolousness of the pretext.

The authorized stock was one thousand shares. Only eight hundred were placed. The fifteen directors made an agreement to take over the other two hundred at $150 per share, or $30,000, and raise the money on a note, whereon they should be equally liable *inter sese*, renew it from time to time, each paying his share of interest and revenue stamp; stock to be sold off to parties deemed acceptable, and proceeds used to reduce the note; dividends likewise. There was a tontine feature in that if any subscriber should die, his interest in the stock would lapse and his estate would get back what he had put in. The feature of importance here is that in paragraph 9 of the trust agreement, if any subscriber should *refuse, neglect or fail* to execute the renewal notes from time to time, or should *refuse* to perform the covenants and agreements made herein * * * such subscriber * * * shall be entitled to return of money paid on principal * * * but * * * not * * * to return of any money paid for interest or revenue stamps * * * *or any further interest in the trust or trust fund.*

What happened was this: Feldhage, one of the subscribers and president of the company, died in July, 1922, leaving fourteen subscribers remaining on the agreement. Ruhle, the vice-president, seems to have wanted the vacant place, but some of the others thought him unsuited and wanted Meeks, who was the trustee of the stock. There was a split, and the natural contest for the control of the two hundred shares.

It was discovered that when the first renewal of the note was made on May 16th, 1922, Mr. Walker, one of the original fifteen, had not signed it; apparently because he did not happen to be there at the time and was not reminded of it. There is evidence that Meeks was notified at the time it was offered at the Hudson Trust Company, which was carrying it, and did not take any trouble to call it to Walker's attention, though Walker *did* pay his share of the discount and tax and did sign with the rest at the next renewal in September. The election was due in January. In November the situation seems to have become acute and Meeks apparently, of his own motion, wrote Walker that because of his failing to sign in May he was out of the syndicate, and sent him a check for the interest, &c., he had paid. Walker repudiated the proposition and the fight was on. The Ruhle faction served notice on Meeks the day of the election that they protested his voting of the shares. This was just after a meeting of the "subscribers," which Walker attended, though ignored in the notice, at which the nine-four-one vote was taken.

1. We are clear that a "vote of two-thirds of all the subscribers" means an affirmative vote of two-thirds of all existing subscribers. So if there were fourteen, it needed ten votes to determine how the shares were to be voted.

2. We are clear that there were fourteen of the "subscribers."

It seems pretty plain that the omission of Walker's signature to the note of May 16th was a mere oversight, perhaps purposely taken advantage of, especially as Adler, who had not signed, was hunted up and asked for his signature. Any business man knows how these things are done; someone takes charge and sees that the others do their duty.

The words "refuse, neglect or fail" seem, when taken together, to imply voluntary neglect or failure, and not mere forgetfulness. Moreover, when Walker signed again in September, he was again liable with the others, and we need not inquire what he would have done if the bank had refused to renew. If he was good enough to go on the Septem-

ber note, he was good enough to remain a "subscriber" and not be ousted by the action of Meeks.

So we reach the result that the direction to Meeks as to voting was no direction. It follows, we think, that he was without authority in the premises. If so, by voting the stock he violated the express terms of his trust, and deprived the minority of a substantial right.

The foregoing conclusions lead to the further result that there was no quorum of stock represented at the meeting, judged either by the by-laws or by the Corporation act; for Meeks could not in justice "represent" his *cestuis* without their instructions given according to the trust agreement, nor could he vote their stock without such instruction. So that either under the Corporation act, which speaks of "representation," or the by-laws which make "voting" a majority of the stock the test, the syndicate stock was disqualified, as between the parties.

Respondents object to the entire proceeding on the ground that they did not have the notice of the application required by the statute. Notice was in fact given of an application, which was heard by Mr. Justice Swayze. Respondents assert, though we think it is not made to appear in the case, that he declined to hear objections to the application. But whatever he did, or did not do, we do not think it is a subject of review before us, for the statute provides for application to "the Supreme Court," and the intendment should be that the justice was sitting as the practice branch of the Supreme Court by consent, and his action would not be reviewable by us. *Garbett* v. *Mountford*, 70 *N. J. L.* 577; see *Dubelbeiss* v. *West Hoboken*, 81 *Id.* 10?.

As to the point that there should have been a suit in chancery to enjoin the trustee, we do not say that such a bill would not have been proper; but section 42 is very broad in permitting this court to give such relief as right and justice may require. We are not asked to declare a different result of the election, and probably could not do so. *In re Leslie*, 58 *N. J. L.* 609. But as was intimated in that case,

we have power to set the election aside and order a new one; *Ib.* 616; and at such new election the atmosphere should be somewhat cleared by what has been decided above.

Let the election be set aside and a new election ordered.